PUBLISH

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

_____

No. 96-3026
_____

D.C. Docket No. 96-201-CIV-FTM-25  HLA


HENRY GREENE MITCHELL,

                              Plaintiff-Appellant,


        versus


DAVE FARCASS, Superintendent,
Hendry Correctional Institution,

J. KING, Inspector Hendry
Correctional Institution,

                              Defendants-Appellees.



_____
           Appeal from the United States District Court
                 for the Middle District of Florida
_____


                        **(May 6, 1997)**
Before HATCHETT, Chief Judge, ANDERSON, Circuit Judge, and LAY[*],
Senior Circuit Judge.


HATCHETT, Chief Judge:


_____

[*] Honorable Donald P. Lay, Senior U.S. Circuit Judge for the
Eighth Circuit, sitting by designation.

In this prisoner civil rights action, we consider challenges to provisions of the Prison Litigation Reform Act of 1995 ("PLRA" or "the Act"), Title VIII of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (Apr. 26, 1996). We hold that: (1) the provisions of the PLRA codified at 28 U.S.C. § 1915(e)(2) apply to cases pending prior to the Act's passage; (2) the filing fee requirements of the PLRA do not violate the Constitution's guarantee of equal protection; (3) to the extent the PLRA's filing fee requirements conflict with Federal Rule of Appellate Procedure 24(a), the Act's provisions control; (4) Federal Rule of Civil Procedure 12(b)(6) standards govern our review of dismissals under section 1915(e)(2)(B)(ii); and (5) the district court erred in dismissing the appellant's First Amendment retaliation claim under section 1915(e)(2)(B)(ii).

## I. BACKGROUND

On January 29, 1996, appellant Henry Mitchell, a Florida prisoner proceeding pro se, initiated this lawsuit pursuant to 42 U.S.C. § 1983 against Dave Farcass, Superintendent of the Hendry Correctional Institution ("HCI"), and J. King, an inspector at HCI. The district court granted Mitchell's motion to proceed in forma pauperis ("IFP"). Mitchell's complaint alleges the following factual scenario.

In late December 1995, Mitchell, then an inmate at HCI, wrote a letter to the Naples, Florida office of the National

2

Association for the Advancement of Colored People in which he complained about the religious services at HCI. Mitchell also sent copies of this letter to several officials of Florida's correctional system, including Farcass. On January 15, 1996, Mitchell submitted an inmate request to Farcass, asking him to explain "why no black culture churches were being allowed to come into [HCI] like the [S]panish culture churches and the white churches." In this request, Mitchell claimed that HCI's religious services did not comply with the provision of the Florida Administrative Code that governs chaplaincy services at state correctional institutions. According to Mitchell, around eighty other inmates had submitted requests "asking the same question or pertaining to that subject."

The following day, January 16, a prison employee told Mitchell to report to "C-Building." Upon his arrival, Mitchell met with Farcass, other HCI officials and another inmate. Farcass had in his possession the inmate requests concerning the chaplaincy services, including Mitchell's request. Mitchell guesses that the officials requested his and the other inmate's presence at this meeting because they considered the two inmates "to be the leaders." Farcass told the inmates that the amount of requests upset him and that "some one could be charged with [in]citing a riot." Farcass, however, also told Mitchell and the other inmate that the "meeting was to address the issue presented in the requests" and that they "were not being charged with anything, . . . were not going to get locked up, [and] were not

3

going to get transfer[r]ed." Farcass informed the inmates that officials had to process paperwork in order for representatives from black churches to begin visiting HCI.

The next day, January 17, an HCI employee told Mitchell to report to the chaplain, and Mitchell wound up meeting with the chaplain, assistant chaplain and assistant superintendent of HCI. The assistant superintendent stated that the purpose of the meeting was for the chaplain to explain the procedures churches had to comply with before they could be permitted to provide religious services at HCI. During the meeting, someone called the assistant superintendent from the room. Upon returning, the assistant superintendent reported that Farcass and King had ordered Mitchell placed in administrative confinement while HCI officials investigated whether he was responsible for inciting a riot.

HCI officials placed Mitchell in administrative confinement that same day. When officials brought Mitchell his property, he found that his legal materials had been "smashed" and "crushed." Later, in the evening, three correctional officers entered Mitchell's cell, handcuffed him behind his back, and "smashed" his legal work and property. Thereafter, Mitchell submitted another inmate request to Farcass, this time asking that he be placed in "protective management" because he feared further retaliation from the HCI staff.

Mitchell asserts that Farcass and King breached his rights under the First, Fifth, Eighth and Fourteenth Amendments; he

4

seeks monetary relief.  On June 18, 1996, the district court addressed Mitchell's complaint.  Recognizing Mitchell's IFP status, the court assessed his pleading under the provisions of section 804(a) of the PLRA that are now codified at 28 U.S.C. § 1915(e)(2).  The court held, "[a]fter reading Plaintiff's complaint in a liberal fashion," that Mitchell could "prove no set of facts in support of his claim that would entitle him to relief."  Therefore, the court dismissed Mitchell's complaint <u>sua sponte</u> pursuant to section 1915(e)(2)(B)(ii).[1]

Thereafter, Mitchell moved in the district court to proceed IFP on appeal.  On July 31, 1996, the court granted the motion (thus allowing Mitchell to proceed without prepaying the entire $105 appellate docketing and filing fee) and applied the filing fee provisions of PLRA section 804(a), see 28 U.S.C.A. § 1915(a), (b) (West Supp. 1997).  As a result, the court ordered Mitchell to tender payment of a fee equal to twenty percent of his average monthly deposits to his prison account (this fee totalled $4) and make monthly payments (submitted with updated account statements) equal to twenty percent of the income credited to his account each preceding month, until he paid the full docketing and filing fee.  Mitchell filed his notice of appeal on July 3, 1996.

In his <u>pro se</u> brief to this court, Mitchell argued, among other things, that the district court erred in applying section 1915(e)(2) to his complaint because he commenced this lawsuit

---

[1] Farcass and King were never served with Mitchell's complaint.

prior to the PLRA's enactment on April 26, 1996, and that the filing fee provisions of the PLRA violated constitutional norms. This court appointed Mitchell a lawyer and placed this case on the oral argument calendar. The United States intervened in this action pursuant to 28 U.S.C. § 2403(a), and the State of Florida participated as amicus curiae.

## II. DISCUSSION

### A.

The first issue we address is whether section 1915(e)(2) applies to cases pending prior to the enactment of the PLRA. The district court's determination of this issue was one of law; we review it under the de novo standard. E.g., Goldsmith v. City of Atmore, 996 F.2d 1155, 1159 (11th Cir. 1993).

Prior to the passage of the PLRA, section 1915 permitted a court to dismiss a case authorized under that section if "satisfied that the action is frivolous or malicious." 28 U.S.C. § 1915(d) (1994). As amended by the PLRA, however, section 1915 now provides that a court "shall dismiss the case at any time" if it determines that the "action or appeal" is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C.A. § 1915(e)(2)(B) (West Supp. 1997). As stated, the district court dismissed Mitchell's complaint under section 1915(e)(2)(B)(ii).

"Landgraf v. USI Film Products, 511 U.S. 244, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994), provides the analytical framework

6

for determining whether newly enacted statutory provisions are applicable to pending cases." Hunter v. United States, 101 F.3d 1565, 1569 (11th Cir. 1996) (en banc), petition for cert. filed, 65 U.S.L.W. 3648 (U.S. Mar. 10, 1997) (No. 96-1443). Under Landgraf, our first inquiry is "to determine whether Congress has expressly prescribed the statute's proper reach." 114 S. Ct. at 1505. Here, however, Congress has simply not spoken on the issue. Accordingly, we should apply section 1915(e)(2) to pending cases unless doing so would engender a "retroactive effect." Landgraf, 114 S. Ct. at 1505; see also Hunter, 101 F.3d at 1570. A new statute has a retroactive effect if, in applying it to a pending case, it (1) impairs rights a party possessed when he or she acted, (2) increases a party's liability for past conduct, or (3) imposes new duties with respect to transactions already completed. Landgraf, 114 S. Ct. at 1505; Hunter 101 F.3d at 1570.

The second and third indices of statutory retroactive effect outlined above clearly have no application to this case, and Mitchell makes no argument to the contrary. The issue for us to consider then, is whether the application of section 1915(e)(2) to this case "would impair rights [Mitchell] possessed when he acted." Landgraf, 114 S. Ct. at 1505. Mitchell states that under pre-PLRA section 1915, the first test of the sufficiency of his complaint would probably have come after the defendants had filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(6), after which time he could have amended his complaint in

7

light of the defendants' motion. Therefore, Mitchell contends, the application of the PLRA amendments to his case deprived him of the more liberal procedural treatment he had anticipated receiving under the old provisions of section 1915(d).

We have little difficulty in concluding that Mitchell's position fails. As this court stated in Hunter, "the term `rights' as used in this context should not be construed broadly so as to sweep within its ambit mere expectation interests under procedural or remedy rules." 101 F.3d at 1572. Mitchell concedes, as he must, that the PLRA amendments at issue are "wholly procedural"; moreover, we cannot say that Mitchell has anything more than an expectation interest in having pre-PLRA section 1915 applied in his case. Indeed, we find the appellants' position in Hunter (i.e., that applying the certificate of appealability provisions of the Antiterrorism and Effective Death Penalty Act of 1996 to pending cases would produce a retroactive effect), which this court sitting en banc unanimously rejected, much more compelling than Mitchell's argument. See Hunter, 101 F.3d at 1568-73. Consequently, we agree with the Ninth Circuit that section 1915(e)(2) "raises no retroactivity concerns under Landgraf." Marks v. Solcum, 98 F.3d 494, 496 (9th Cir. 1996).

**B.**

We next consider whether the filing fee provisions of the PLRA (1) withstand equal protection review and (2) are superseded

8

by Federal Rule of Appellate Procedure 24(a).  These issues present legal questions that we address in plenary fashion.  E.g., Collins v. American Cast Iron Pipe Co., 105 F.3d 1368, 1370 (11th Cir. 1997).

Section 804(a) of the PLRA refashioned the procedures prisoners must observe when seeking to proceed IFP in civil actions.  Title 28 U.S.C. § 1915(a)(2) now provides:

> A prisoner seeking to bring a civil action or appeal a judgment in a civil action or proceeding without prepayment of fees or security therefor, in addition to filing the affidavit filed under paragraph (1), shall submit a certified copy of the trust fund account statement (or institutional equivalent) for the prisoner for the 6-month period immediately preceding the filing of the complaint or notice of appeal, obtained from the appropriate official of each prison at which the prisoner is or was confined.

28 U.S.C.A. § 1915(a)(2) (West Supp. 1997).  Section 1915(b) now reads:

> (b)(1) Notwithstanding subsection (a), if a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee.  The court shall assess and, when funds exist, collect, as a partial payment of any court fees required by law, an initial partial filing fee of 20 percent of the greater of--
>
> (A) the average monthly deposits to the prisoner's account; or
>
> (B) the average monthly balance in the prisoner's account for the 6-month period immediately preceding the filing of the complaint or notice of appeal.
>
> (2) After payment of the initial partial filing fee, the prisoner shall be required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account.  The agency having custody of the prisoner shall forward payments from the prisoner's account to the clerk of the court each time the amount in the account exceeds $10 until the filing fees are paid.

(3) In no event shall the filing fee collected exceed the amount of fees permitted by statute for the commencement of a civil action or an appeal of a civil action or criminal judgment.

(4) In no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee.

28 U.S.C.A. § 1915(b) (West Supp. 1997).

Mitchell contends that the PLRA's filing fee requirements fail equal protection rational basis review and thus deny him due process under the Fifth Amendment.[2] "The first step in determining whether legislation survives rational-basis scrutiny is identifying a legitimate government purpose--a goal--which the enacting government body <u>could</u> have been pursuing." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995). "The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting governmental body to believe that the

_____

[2] In his brief to this court, Mitchell's counsel made clear that

Mr. Mitchell does not contend that the amended statute's different treatment of indigent prisoners implicates the line of Supreme Court cases beginning with <u>Griffin v. Illinois</u>, 351 U.S. 12 (1956), which generally prohibits making access to the appellate process dependent on the appellant's ability to pay. . . . Mr. Mitchell also does not contend that prisoners (or specifically indigent prisoners) are a suspect class for purposes of his equal-protection claim.

Appellant's Br. at 17-18. We note that both the Fourth and Sixth Circuits have considered and rejected each of these contentions in denying challenges to the PLRA. <u>See</u> Roller v. Gunn, 107 F.3d 227, 231-33 (4th Cir. 1997); Hampton v. Hobbs, 106 F.3d 1281, 1284-87 (6th Cir. 1997).

10

legislation would further the hypothesized purpose." Haves, 52 F.3d at 922.

After reviewing the statutory framework of the PLRA, this court recently concluded that Congress promulgated the Act to curtail abusive prisoner tort, civil rights and conditions litigation. Anderson v. Singletary, No. 96-2697, --- F.3d ---, --- (11th Cir. 1997); see also Hampton v. Hobbs, 106 F.3d 1281, 1286 (6th Cir. 1997) ("The legislation was aimed at the skyrocketing numbers of claims filed by prisoners--many of which are meritless--and the corresponding burden those filings have placed on the federal courts."); Santana v. United States, 98 F.3d 752, 755 (3d Cir. 1996) ("Congress enacted the PLRA primarily to curtail claims brought by prisoners under 42 U.S.C. § 1983 and the Federal Tort Claims Act, most of which concern prison conditions and many of which are routinely dismissed as legally frivolous."). Clearly, Congress had a rational basis to believe that the fee requirements of the PLRA would further this objective. As the Sixth Circuit recently found:

> Congress sought to put in place economic incentives that would prompt prisoners to "stop and think" before filing a complaint. Congress's rationale for placing the fee requirements on prisoners is captured in the statements of Senator Kyl:
>
> > Section 2 will require prisoners to pay a very small share of the large burden they place on the Federal judicial system by paying a small filing fee upon commencement of lawsuits. In doing so, the provision will deter frivolous inmate lawsuits. The modest monetary outlay will force prisoners to think twice about the case and not just file reflexively. Prisoners will have to make the same decision that law-abiding Americans must

11

> make: Is the lawsuit worth the price?
> Criminals should not be given a special
> privilege that other Americans do not have. .
> . .
>
> The volume of prisoner litigation
> represents a large burden on the judicial
> system, which is already overburdened by
> increases in nonprisoner litigation. Yet
> prisoners have very little incentive not to
> file nonmeritorious lawsuits. Unlike other
> prospective litigants who seek poor person
> status, prisoners have all the necessities of
> life supplied, including the materials
> required to bring their lawsuits. For a
> prisoner who qualifies for poor person
> status, there is no cost to bring a suit and,
> therefore, no incentive to limit suits to
> cases that have some chance of success.
>
> The filing fee is small enough not to deter a
> prisoner with a meritorious claim, yet large
> enough to deter frivolous claims and multiple
> filings.
>
> 141 Cong. Rec. S7526 (daily ed. May 25, 1995)
> (statement of Sen. Kyl) (citations omitted).

Hampton, 106 F.3d at 1286-87. In addition to the foregoing, we note that prisoners "often have free time on their hands that other litigants do not possess." Roller v. Gunn, 107 F.3d 227, 234 (4th Cir. 1997). Moreover, prisoners have unique incentives to file meritless or frivolous lawsuits, e.g., to attempt to obtain a "short sabbatical in the nearest federal courthouse," Cruz v. Beto, 405 U.S. 319, 327 (1972) (Rehnquist, J., dissenting), or to harass prison officials or correctional officers. See, e.g., Nasim v. Warden, Md. House of Correction, 64 F.3d 951, 953-54 n.1 (4th Cir. 1995) (en banc) (noting that "all too often" prisoner litigation is initiated to harass prison officials), cert. denied, 116 S. Ct. 1273 (1996). In short,

12

"[d]eterring frivolous prisoner filings in the federal courts falls within the realm of Congress's legitimate interests, and the specific provisions in question are rationally related to the achievement of that interest." Hampton, 106 F.3d at 1287; accord Roller, 107 F.3d at 230-31, 233-34.

Mitchell bases his equal protection challenge on Rinaldi v. Yeager, 384 U.S. 305 (1966). In that case, the Court struck down a New Jersey statute that required unsuccessful criminal appellants who were incarcerated, but not unsuccessful criminal appellants who were not imprisoned, to reimburse the state for the costs of trial transcripts. 384 U.S. at 308. In so doing, the Court found that the classification at issue did not further any of the purported bases for the law -- reimbursement, administrative convenience or deterrence of frivolous appeals. 384 U.S. at 309-11. Mitchell argues that the "distinction made in 28 U.S.C. § 1915(b) between incarcerated indigent [litigants] and all other indigent [litigants] is nearly identical to the distinction made in Rinaldi."

We find Rinaldi inapposite. Unlike the situation here, that case involved an "unreasoned distinction," i.e., the Court could not find any justification for the classification the New Jersey statute made. See Rinaldi, 384 U.S. at 309-10. In enacting the PLRA, however, Congress had ample justification (e.g., prisoners often have an abundance of free time, live in a nearly cost-free environment, and have unique incentives to file meritless or

13

frivolous lawsuits) in differentiating between indigent prisoners and other litigants.  See Roller, 107 F.3d at 234 n.2.

Next, Mitchell contends that the fee provisions of the PLRA stand in apparent conflict with Federal Rule of Appellate Procedure 24(a), which states that once a district court grants a party's motion to proceed IFP, "the party may proceed without further application to the court of appeals and without prepayment of fees or costs in either court or the giving of security therefor."  Fed. R. App. P. 24(a).[3]  The Fifth Circuit recently considered this issue and cited authority for the proposition that "a statute passed after the effective date of a federal rule repeals the rule to the extent that it actually conflicts."  Jackson v. Stinnett, 102 F.3d 132, 135 (5th Cir. 1996).  The court went on to hold that "[t]o the extent that the Rules Enabling Act (as expressed in Rule 24(a)) actually conflicts with the PLRA, we hold that the statute repeals the Rule."  Jackson, 102 F.3d at 136.  We adopt the analysis and holding of the Jackson court.  See 102 F.3d at 134-36; see also Floyd v. United States Postal Serv., 105 F.3d 274, 278 (6th Cir. 1997) ("[T]o the extent that Rule 24(a) conflicts with the PLRA, we hold that the statute repeals Rule 24(a).").

## C.

---

[3] Although Mitchell discussed this issue in his brief, he did not formally assert it.  He did, however, pursue the issue at oral argument, and therefore we address it.  See Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1561 n.11 (11th Cir. 1995).

Finally, we address the propriety of the district court's dismissal of this action, i.e., whether the district court correctly concluded that Mitchell failed to state a claim on which relief may be granted. The language of section 1915(e)(2)(B)(ii) tracks the language of Federal Rule of Civil Procedure 12(b)(6), and we will apply Rule 12(b)(6) standards in reviewing dismissals under section 1915(e)(2)(B)(ii). Of course, we review dismissals under Rule 12(b)(6) de novo, viewing the allegations in the complaint as true. E.g., South Fla. Water Management Dist. v. Montalvo, 84 F.3d 402, 406 (11th Cir. 1996).

"To state a first amendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right. . . . The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech." Thomas v. Evans, 880 F.2d 1235, 1242 (11th Cir. 1989). In Bridges v. Russell, 757 F.2d 1155, 1157 (11th Cir. 1985), we reversed the dismissal of a complaint where the prisoner-appellant alleged that officials transferred him to another facility because he (1) filed a grievance against his work supervisor alleging racial discrimination in the assignment of work duties; (2) actively encouraged other inmates to sign a petition in protest of this treatment; and (3) prepared a similar grievance on behalf of another inmate. In our view, it does not appear beyond doubt that Mitchell can prove no set of facts that would entitle him to relief on his First Amendment claim for retaliation. See Bridges, 757 F.2d at 1157; see also Wildberger

15

v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989); Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986). Accordingly, we reverse the district court and remand for further proceedings on this issue.

### III.  CONCLUSION

For the foregoing reasons, we hold that: (1) the PLRA's filing fee provisions easily pass equal protection rational basis review; (2) to the extent those provisions conflict with Federal Rule of Appellate Procedure 24(a), the PLRA controls; (3) the district court was correct in concluding that 28 U.S.C. § 1915(e)(2) applied in this case; (4) Federal Rule of Civil Procedure 12(b)(6) standards govern our review of dismissals under section 1915(e)(2)(B)(ii); and (5) the district court erred in dismissing Mitchell's First Amendment retaliation claim pursuant to section 1915(e)(2)(B)(ii).  As a result, we remand to the district court for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**